**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:12-CR-004** |
| | : | |
| | : | **(Chief Judge Conner)** |
| v. | : | |
| | : | |
| **ADVANTAGE MEDICAL** | : | |
| **TRANSPORT, INC. and SERGE** | : | |
| **SIVCHUK** | : | |

## MEMORANDUM

Presently before the court are sentencing memoranda concerning the loss amount to be attributed to defendants Advantage Medical Transport, Inc. ("Advantage") and Serge Sivchuk ("Sivchuk") for their participation in Medicare fraud. Specifically, the court must determine whether Advantage was entitled to receive payment from Medicare for 9,432 non-emergency, dialysis ambulance transports of 26 beneficiaries from 2007 to 2011. For the following reasons, the court finds that a loss amount of $968,201.50 is appropriate.

## I.   Background[1]

Advantage was a licensed ambulance transport company in Harrisburg. Sivchuk served as its director, president, and managing employee. Advantage typically transported patients to and from dialysis treatment centers and then submitted Medicare claims for those transports.

---

[1] The court's findings are based upon the court's assessment of the credibility of the testimony and information provided at the evidentiary hearing held on November 12 and November 13, 2013.

Medicare covers non-emergency ambulance transport if it is a "medical necessity." A "medical necessity" exists if (1) the beneficiary is bed-confined, and other means of transportation are contraindicated; or (2) the beneficiary's medical condition, regardless of bed confinement, requires medical transport. 42 C.F.R. § 410.40(d)(1). A beneficiary is "bed-confined" if the beneficiary (1) is unable to get up from bed without assistance; (2) is unable to ambulate; or (3) is unable to sit in a chair or wheelchair. Id. Bed confinement is only one factor among many in medical necessity determinations. Id.

For non-emergency, scheduled, repetitive ambulance services, the ambulance provider must obtain a Certificate of Medical Necessity ("CMN") from the beneficiary's attending physician certifying that the medical necessity requirements are satisfied. Id. § 410.40(d)(2). A CMN must be no older than sixty days at the time of transport. Id. The presence of a signed CMN does not by itself indicate the medical necessity of the ambulance transport. Id.

After each transport, the attending Advantage Emergency Medical Technician ("EMT") would complete and sign a trip sheet, which contains pertinent details about the patient and the transport. The ambulance driver also signed this sheet. Trip sheets were kept at Advantage's office.

In August 2010, Highmark, the third party contractor who handles Medicare claims in Pennsylvania, notified Advantage that it would be conducting an audit of its claims. Advantage was selected for review because its billings for dialysis transports were higher than its peer group. The notice directed Advantage to

submit all supporting documents, including trip sheets for 40 dialysis transports of seven dialysis treatment beneficiaries conducted in August 2010.

Fourteen of the 40 trip sheets contained references to the beneficiary's ambulatory abilities. Sivchuk, along with David Paul ("Paul"), an Advantage EMT, and Vlade Panchenko ("Panchenko"), an Advantage administrative assistant, instructed the EMTs to re-write the 14 trip sheets to omit the beneficiary's ambulatory abilities. Some EMTs re-wrote their trip sheets, and Paul and Panchenko re-wrote the rest and forged the EMTs' signatures. Sivchuk submitted the trip sheets, along with the rest of the appropriate documentation, to Highmark, who approved all 40 claims.

On June 2, 2011, agents conducted a search of Advantage's office. In addition, agents interviewed 26 former Advantage EMTs. (See Govt's Exh. 113, 113(A)). The EMTs identified 26 beneficiaries who could have been safely transported to dialysis without an ambulance transport. (See Govt's Exh. 68).

On January 11, 2012, a federal grand jury indicted Sivchuk and Advantage with 14 counts of Health Care Fraud, pursuant to 18 U.S.C. § 1347 (Counts 1-14). (Doc. 1). The grand jury also charged Sivchuk with 14 counts of False Statements in Health Care Matters, pursuant to 18 U.S.C. § 1035 (Counts 15-28) and Conspiracy (Count 29). (Id.)

On February 22, 2013, Sivchuk pleaded guilty to Count 15, a false statements count. (Doc. 97). On May 1, 2013, Advantage pleaded guilty to a Superseding Information (Doc. 103) charging it with the 14 false statements counts.

The United States Probation Office conducted a pre-sentence investigation report and prepared presentence reports for both Advantage and Sivchuk. The presentence reports recommend a loss amount of $740,310, based on 4,670 trip sheets that reference the ambulatory abilities of the 26 beneficiaries identified by the EMTs as individuals who did not need ambulance transport.[2] Based on this computation, the probation officer adds a 14-level increase to both Sivchuk and Advantage's base offense level of six pursuant to U.S.S.G. § 2B1.1(b)(1)(H) (2013). The probation officer also computes Advantage's Guidelines fine range, $592,248 to $1,184,496, based on this loss amount.

The government asserts that the loss amount should be $1,821,661 for 9,432 ambulance transports of the 26 beneficiaries from 2007 to 2011, regardless of whether each transport trip sheet referenced the patient's ambulatory abilities.[3] Thus, the government contends that Sivchuk and Advantage should be subject to a 16-level increase to their base offense level of six pursuant to § 2B1.1(b)(1)(I).

Advantage and Sivchuk assert that the loss amount should be based on the transports corresponding to the 14 trip sheets that they accept responsibility for

---

[2] The government asserted that it mistakenly reported to the Probation Office that 4,670 trip sheets reference the beneficiaries' ambulatory abilities when in fact the number is 3,776, resulting in a loss amount of $741,054. (Doc. 122 at 17 n.11).

[3] In the government's initial sentencing memorandum, it asserts that the loss amount should be $1,821,321 for 9,430 transports. (See Doc. 122). However, the government subsequently adjusted these figures—to $1,821,661 for 9,432 transports—as reflected at the hearing and in the government's subsequent memoranda.

altering, which would result in a loss amount of $2,939.27 and no corresponding increase to their base offense level.  See § 2B1.1(b)(1)(A).  They contend that the dialysis patients would have qualified for ambulance transport due to medical necessity.

On November 12 and 13, 2013, the court held an evidentiary hearing to determine the amount of loss attributable to Sivchuk and Advantage.  The government called FBI Special Agent Richard Oh ("Agent Oh"), who outlined the government's investigation of Advantage and Sivchuk.  The government introduced a number of exhibits through Agent Oh, including evidence of altered trip sheets and CMNs, Advantage and Sivchuk's efforts to control the content of the trip sheets, and innumerable evidence of the ambulatory abilities of the 26 beneficiaries. (See Doc. 141 at 8-120, Doc. 142 at 27-41).

Nicole Watson, a Certified Public Accountant, also testified concerning her analysis of Medicare's payments to Advantage between 2008 and 2011 and the specific amounts paid for the ambulance transport of the 26 beneficiaries.  (See Doc. 141 at 120-137; Govt's Exh. 69, 75).  Lisa Small, a Medicare contract fraud investigator, testified concerning the pre-payment and stop payment options Medicare could have exercised had it known about Sivchuk's fraud at the time of the August 2010 audit.  (Doc. 141 at 137-151).

Defendants called an expert witness, Dr. Ralph E. Duncan ("Dr. Duncan"), to testify concerning whether ambulance transports for several of the 26 beneficiaries

were medically necessary.[4]  (Doc. 141 at 177-250; Deft's Exh. 1).  Defendants also

called a number of treating physicians, who testified as to whether ambulance

transport was medically necessary for their patients. (Doc. 141 at 152-177; Doc. 142

at 6-27, 41-119; Deft's Exh. 2, 3, 4).  A number of the physicians testified that

ambulance transportation may be necessary even in cases where the patient is

ambulatory, depending upon the patient's overall medical condition.  (See, e.g.,

Doc. 141 at 158).  Four physicians were unable to testify, but filed affidavits with the

court detailing their opinions concerning the medical necessity of ambulance

transport for their patients.  (See Deft's Exh. 5; Docs. 131, 132, 133).

The court directed the parties to file supplemental memoranda addressing

their respective proposed loss amounts.  This issue is fully briefed and ripe for

disposition.

## II.   **Legal Standard**

In sentencing, a court must engage in a three-step process pursuant to Gall v.

United States, 522 U.S. 38 (2007).  First, it must calculate the advisory Guidelines

range.  United States v. Wright, 642 F.3d 148, 152 (3d Cir. 2011).  Second, the court

must formally rule on any motions for departure and state the impact, if any, of

---

[4] For several beneficiaries, the government emphasizes that the court should
not credit Dr. Duncan's opinion because (1) Dr. Duncan relied on CMNs that
Advantage provided him, and (2) the government demonstrated that Advantage
altered numerous CMNs.  (See Govt's Exh. 89-111a).  The court has taken this
concern into consideration.  However, viewed in its entirety, Dr. Duncan's report
incorporates a variety of different sources that provide a substantial basis for his
conclusions.

such ruling on the Guidelines calculation.  Id.  Third, the court is required to exercise its discretion and consider the sentencing factors set forth in 18 U.S.C. § 3553(a), which may vary from the advisory guidelines range.  Id.

Generally, the government bears the burden to prove any facts that may warrant a Guidelines enhancement by a preponderance of the evidence.  United States v. Ali, 508 F.3d 136, 143 (3d Cir. 2007).  Section 2B1.1(b)(1) of the Sentencing Guidelines provides for increases to a defendant's offense level based upon the amount of loss attributable to fraud.  U.S.S.G. § 2B1.1(b)(1).  The loss amount is a specific offense characteristic, and thus, the government bears the burden of persuasion.  United States v. Diallo, 710 F.3d 147, 151 (3d Cir. 2013).  Once the government presents *prima facie* evidence of a given loss figure, the burden of production shifts to the defendant.  Id. at 151.  Determining an appropriate loss amount stemming from fraud is an exceedingly difficult task for the court.  Thus, the government need not prove the loss amount with absolute certainty.  Ali, 508 F.3d at 145.  Instead, the court must only make a "reasonable estimate" of the loss amount based on the evidence.  Id. (quoting U.S.S.G. § 2B1.1 cmt. 3(C)).

## III.   **Discussion**

The court will estimate a reasonable loss amount by first examining whether the government has presented *prima facie* evidence of a given loss figure and then, if applicable, examining the defendants' rebuttal evidence.

A.    **The Government's *Prima Facie* Case**

The government proposes a loss amount of $1,821,661, which reflects the

proceeds from Advantage's 9,432 ambulance transports of the 26 beneficiaries for

dialysis from 2007 to 2011.  The government's proposed loss amount relies heavily

on the testimony of Agent Oh.  (See Doc. 141 at 8-120).  Agent Oh testified that

during a search of Advantage's office, investigators found a folder labeled

"Rewritten Trip Sheets" containing 14 forged and rewritten trip sheets that

Advantage submitted in response to a Medicare audit in August 2010.[5]  (Doc. 141 at

21-27; Govt's Exh. 1-27a, 73).  The trip sheets were rewritten to omit ambulatory

descriptions of the patients at the time of pickup.  (Id.)  Agent Oh also discussed

seven more trip sheets that were rewritten after the August 2010 audit.[6]  (Doc. 141

at 52-58; Govt's Exh. 28(B)-(H)).  Agent Oh further established that Advantage and

Sivchuk altered or embellished 23 CMNs.[7]  (Doc. 141 at 103-114; Govt's Exh. 89-

111a).

Agent Oh discussed how Jessica Wolfe ("Wolfe"), a dispatcher at Advantage

who became an informant for the government, advised him that Advantage was

---

[5] In an effort to protect the beneficiaries' identities, the court employs the
first name and last initial of each beneficiary throughout the opinion.  The 14 trip
sheets pertained to transports of the following seven beneficiaries: Michael M.,
Doris B., James R., Helen W., Sandra Ba., Walter T., and Joel R.

[6] The seven additional trip sheets pertained to transports of the three
following beneficiaries: Doris B., Walter T., and Michael M.

[7] The CMNs pertained to Doris B., Sandra Bo., Daniel F., Reginald H., Walter
T., Richard W., Carol E., Helen W., and Sandra Ba.

transporting patients via ambulance when it was not necessary.  Wolfe provided the investigators with a document labeled "Completing Narratives Properly," that instructed EMTs to write trip sheets in a particular manner, in essence, to avoid Medicare audit detection.  (Doc. 141 at 11-12, 27-30; Govt's Exh. 53).  Significantly, the document instructs EMTs to omit the type of method used to transfer the patient into the ambulance.  (Id.)  Agent Oh related how Wolfe also provided investigators with copies of meeting agendas, dating from the fall of 2010 to the spring of 2011, that also instructed EMTs how to write trip sheets in a way to conceal the ambulatory nature of the beneficiary.  (Doc. 141 at 30-38, 41-46; Govt's Exh. 55-58).  Finally, Agent Oh stated that Wolfe provided investigators with a list entitled "Patients Who Can Go by Wheelchair," which identified 13 Medicare beneficiaries[8] who could be transported to dialysis by wheelchair.  (Doc. 141 at 38-41; Govt's Exh. 54).  Sivchuk ordered her to create this document in early 2011 after his parents were indicted in the Eastern District of Pennsylvania for Medicare fraud.  (Doc. 141 at 38-41; Govt's Exh. 54).

Agent Oh authenticated the grand jury testimony and interview reports for 26 former Advantage Emergency Medical Technicians ("EMTs").[9]  (See Doc. 141 at 61-75; Govt's Exh. 113, 113(A)).  These EMTs identified 26 beneficiaries who could

---

[8] Ronald S., William S., Carol E., Doris B., Anna L., Myra T., Patricia C., Vivian M., Sandra Ba., Michael M., and Antoinette E.

[9] The government also included interview reports for Wolfe and Andre Levkovich, owner of Respect Ambulance. (Doc. 141 at 69; Govt's Exh. 113).

have been safely transported to dialysis without ambulance transport. (See Doc.

141 at 76-79; Govt's Exh. 68). The EMTs described how they were instructed by

management to omit references to the beneficiaries' ambulatory abilities, rewrite

trip sheets and forge signatures, and pick up beneficiaries inside their homes. (Doc.

141 at 70-75; Govt's Exh. 113(B)). Agent Oh also referenced reports of interviews

conducted with beneficiaries or beneficiary family members which document 12 of

the 26 beneficiaries'[10] ambulatory abilities and their capability of transport via

automobile. (Doc. 141 at 97-101; Govt's Exh. 112).

The government introduced 4,698 trip sheets that reference the ambulatory

abilities of the 26 beneficiaries. (Doc. 141 at 59-68; Govt's Exh. 78(A)). Agent Oh

discussed records from other transportation companies that transported many[11] of

the 26 beneficiaries by wheelchair van during the same time period that Advantage

billed Medicare for their ambulance transport. (Doc. 141 at 79-94; Govt's Exh. 40-42,

43(A)-(Z), 60-67). In his summary report, Agent Oh also included information

concerning some of the beneficiaries'[12] Medicare-paid doctor's office visits that did

---

[10] Sandra Ba., Doris B., Patricia C., Carol E., Michael M., James R., Joel R., William S., Myra T., Walter T., David T., and Helen W.

[11] Sandra Ba., Doris B., Antoinette E., Jane F., Daniel F., Josephine H., Calas J., Anna L., Vivian M., Joanne O., Joel R., Ronald S., William S., David T., Helen W., and Richard W.

[12] Sandra Ba., Doris B., Sandra Bo., Patricia C., Antoinette E., Jane F., Daniel F., Melvin H., Josephine H., Reginald H., Calas J., Vivian M., Michael M., Joanne O., Doris P., Joel R., James R., Ronald S., William S., Walter T., Myra T., David T., Helen W., and Richard W.

not involve the use of ambulance transport to or from the office, which suggests

that the beneficiaries traveled by wheelchair van or personal vehicle.  (Doc. 141 at

86, 89; Govt's Exh. 43(A)-(Z)).  Agent Oh also contacted the assisted living facilities

where some of the 26 beneficiaries resided.  (Doc. 141 at 94-97; Govt's Exh. 44(A)-

(G)).  The assisted living facility nurses provided Agent Oh with records reflecting

the nature of seven beneficiaries'[13] daily ambulatory activities.

Defendants posit that the government cannot establish its proposed loss

amount by a preponderance of the evidence.[14]  Defendants assert that the ability to

ambulate and medical necessity are not mutually exclusive.  Defendants also assert

that the government failed to request or review patient medical records, failed to

interview the beneficiaries' treating physicians, and did not provide any expert

medical testimony at the evidentiary hearing.  Defendants further object to the

---

[13] Sandra Bo., Antoinette E., Jane F., Ronald S., William S., Richard W., and Doris B.

[14] Defendants state that, for each of the 9,432 transports, the government has the burden to prove that the individual patient was not in need of ambulance transport.  (See, e.g., Doc. 120 at 22 n.5).  The court finds the government's evidence, which addresses the medical necessity of ambulance transport of each beneficiary in broader terms, to be sufficient.  See United States v. Patient Transfer Serv., Inc., 413 F.3d 734, 744-45 (8th Cir. 2005) (finding that the district court did not speculate about the condition of each patient on each of the 2,568 ambulance transports by crediting the testimony presented by the government, which addressed the general medical necessity of the transports as a whole).

government's reliance on the opinions of EMTs and dispatchers,[15] who do not have

the training or expertise of physicians, and argue that even the EMTs could not

reach a consensus on medical necessity.

The court heeds defendants' concerns, but in the face of this overwhelming

amount of evidence concerning the lack of medical necessity for ambulance

transport of the 26 beneficiaries, the government has established, by a

preponderance of the evidence, a *prima facie* case of a loss amount of $1,821,661,

which reflects the proceeds from Advantage's 9,432 ambulance transports of the 26

beneficiaries for dialysis from 2007 to 2011.

---

[15] Defendants contend that the court should not attribute significant weight to the statements of the EMTs and Wolfe because defense counsel did not have the opportunity to cross-examine these individuals.  (See, e.g., Doc. 141 at 28; Doc. 142 at 73-74).  The court reviewed this evidence and has determined that it was sufficiently complete and reliable.  Hence, the court has given it consideration in its determination of the loss amount.

## B.   **Defendants' Burden of Production**

The burden of production now shifts to Sivchuk and Advantage to cast doubt upon the government's *prima facie* case.[16] The court will discuss the 26 beneficiaries according to the type of evidence that defendants produced.  Thus, the court will separately address the following 4 groups of beneficiaries: (1) 11 beneficiaries for whom defendants produced little to no evidence; (2) eight beneficiaries whose treating physicians testified concerning their medical condition at the evidentiary hearing; (3) five beneficiaries for whom defendants produced affidavits from their treating physicians concerning their medical condition; and (4) two beneficiaries for whom the only evidence produced was from defendants' expert witness, Dr. Duncan.

---

[16] The government appears to suggest that because the defense only introduced CMNs for seven of the 26 beneficiaries, the defense cannot claim that Sivchuk and Advantage were entitled to payment from Medicare for the remaining 19 beneficiaries.  (See Doc. 143 at 6, 16-17 ("The failure to prove a CMN was issued for a beneficiary's ambulance transport is, in itself, independently fatal to a claim of payment entitlement."); see also Doc. 143 at 5-6, 11-12, 25).  The government's position is problematic because it attempts to shift the burden of proof onto Sivchuk and Advantage to establish that they were entitled to payment from Medicare for each of the 26 beneficiaries.  As previously noted, the government bears the burden of persuasion to establish the loss amount involved in the offense by a preponderance of the evidence.  Diallo, 710 F.3d at 151.  The court will not base its loss amount decision on defendants' failure to provide CMNs for each of the 26 beneficiaries.  The only CMNs relevant to the court's analysis are the CMNs that defendants authenticated through physician testimony or that were proven by the government to have been altered.  (See Govt's Exh. 89-111a; Deft's Exh. 4-5).  These CMNs are probative of whether the defendants' provision of ambulance transports was medically necessary.

1.    No Defense Production

Defendants did not produce any evidence to counter the government's *prima facie* case concerning the ambulance transports of 11 beneficiaries: Patricia C., Carol E., Antoinette E., Melvin H., Josephine H., Calas J., Anna L., Vivian M., Michael M., David T., and Helen W.[17]  Defendants highlight the fact that there were no patient or family interviews for Josephine H., Melvin H., and Antoinette E., and that Josephine H. and David T. were not part of the original audit group or included in the "Patients Who Can Go by Wheelchair" list.  (Doc. 144 at 28).  However, defendants ignore the plethora of other government evidence pertaining to these beneficiaries, such as the 271 trip sheets referencing Josephine H.'s ambulatory abilities, Melvin H.'s nine Medicare-paid doctor's office visits, the assisted living report's references to Antoinette E.'s ambulatory abilities, and the government's report of David T.'s interview.  (See Doc. 143 at 11).  Defendants have failed to rebut

---

[17] The loss amount stemming from just these 11 beneficiaries is $820,835. (See Doc. 143 at 11).

the government's *prima facie* case of loss amount as it pertains to these 11 beneficiaries.[18]

### 2.    Treating Physician Testimony

The strongest defense testimony came from eight beneficiaries' treating physicians.  The court will address the evidence regarding each beneficiary in turn.

### a.    *Doris B.*

Advantage transported Doris B. by ambulance 1037 times between March 28, 2008 and October 24, 2011—which is more ambulance transports than any other beneficiary.  (Govt's Exh. 69).  Sixteen EMTs identified Doris B. as being capable of safe wheelchair van transport.  (Govt's Exh. 68).  Doris B.'s name appeared on the "Patients Who Can Go by Wheelchair Van List" and there were 564 trip sheets referencing Doris B.'s ambulatory abilities.  (Govt's Exh. 54, 78A).  One of Doris B.'s trip sheets was rewritten for the August 2010 audit, and Advantage altered one of her CMNs.  (Govt's Exh. 73, 89, 89a).  Doris B. went to 23 Medicare-paid doctor's

---

[18] Defendants cite to the testimony of Dr. Richard G. Ulrich ("Dr. Ulrich"), medical director at Spring Creek Nursing Home, for Vivian M., Anna L., and Calas J.  (Doc. 144 at 19-20).  Dr. Ulrich testified that one of his duties as medical director is to sign ambulance requests.  (Doc. 142 at 41-57).  He testified that he relies heavily on the opinions of the attending physicians and floor nurses concerning the necessity of ambulance transportation.  (Id. at 46).  Dr. Ulrich testified that he did not treat Vivian M., Anna L., or Calas J.  (Doc. 142 at 44-47).  And with respect to Vivian M., Dr. Ulrich testified that he could only recall her name.  (Id. at 46-47).  The court does not find Dr. Ulrich's testimony to be particularly persuasive or probative of medical necessity in the face of the government's formidable evidence concerning these beneficiaries.

office visits between July of 2009 and May of 2011 without ambulance transport. (Govt's Exh. 43(B)).  Moreover, Doris B.'s son stated that he often drove his mother to doctor's appointments and other locations during 2010.  (Govt's Exh. 112).

Doris B.'s treating physician, Dr. Brian C. Quirk ("Dr. Quirk"), testified at the evidentiary hearing.  (Doc. 142 at 57-67).  Dr. Quirk treated Doris B. for over ten years.  (Id. at 58).  Dr. Quirk opined that ambulance transport was necessary for Doris B. mainly due to her level of pain.  (Id. at 63).  He chronicled Doris B.'s medical condition, which included diabetes, atrial fibrillation, aortic stenosis, arthritis, chronic renal failure, multiple hip fractures, and a femur fracture.  (Id. at 58-59).  Dr. Quirk stated that Doris B. was non-ambulatory and had difficulty moving around.  (Id. at 60).

Dr. Duncan also testified concerning the medical necessity of ambulance transport for Doris B.  Dr. Duncan stated that Doris B. only required ambulance transport approximately 30% of the time.  (See Deft's Exh. 1).  However, Dr. Duncan testified under cross-examination that the medical records he reviewed encompassed a slightly larger period of time—January 2008 to January 2012—than when defendants transported her.  (Doc. 141 at 239-41).  He also specifically highlighted three relevant periods, during the time of defendants' transport, when she clearly required ambulance transport: April 2011, January 2009, and December 2009.  (Id. at 239-40).  The court has factored all of this evidence into its conclusion concerning loss amount.  Based on this evidence, the court will consider 50% of the value of Doris B.'s ambulance transport, or $105,570, in the loss amount.

16

b.   *Sandra Bo.*

Advantage transported Sandra Bo. via ambulance 41 times between March 6, 2010 and April 22, 2010.  (Govt's Exh. 69).  Three EMTs testified in the grand jury that Sandra Bo. could have been safely transported by a wheelchair van.  (Govt's Exh. 68, 113).  Thirty-three trip sheets documented Sandra Bo.'s use of a wheelchair, and Advantage altered at least one of Sandra Bo.'s CMNs to make it appear as if she was incapable of sitting in a wheelchair.  (Govt's Exh. 78A, 90, 90a).  Records from an assisted living facility confirm that Sandra Bo. could propel and transfer herself in her wheelchair without assistance.  (Govt's Exh. 78A, 44(A)).  Indeed, Sandra Bo. was transported by wheelchair van seven times in March and April 2010.  (Govt's Exh. 43(C)).

Dr. Mohamed Elnour ("Dr. Elnour") testified at the evidentiary hearing concerning his treatment of Sandra Bo. for renal failure from 2007 until her death in 2010.  (Doc. 142 at 15-27).  Significantly, Dr. Elnour clarified that Sandra Bo. required ambulance transport only during the time frame of his two letters, dated December 4, 2009, and January 13, 2010, which authorized such transport.  (Doc. 142 at 19-23; Def't's Exh. 2).  When the government asked Dr. Elnour whether Sandra Bo. could have safely gone to dialysis by wheelchair van in March and April 2010, Dr. Elnour replied, "So I assume, yes, that she could have been coming with other transportation."  (Doc. 142 at 23).

Dr. Duncan testified that Sandra Bo. required ambulance transport for dialysis treatments.  (Doc. 141 at 196).  However, upon closer examination of his

report, Dr. Duncan did not review any records of Sandra Bo. dating from the time period in question.  (See Deft's Exh. 1).  Instead, the last record he reviewed was an Advantage form from January 26, 2010.  (Id.)  For all of these reasons, the court will include the amount Medicare paid to Advantage for the transport of Sandra Bo., $7,340, in its loss amount calculations.

c. *Daniel F.*

Advantage transported Daniel F. 251 times between July 21, 2009 and September 9, 2010.  (Govt's Exh. 69).  Twelve EMTs opined that Daniel F. could have been safely transported by wheelchair van.  (Govt's Exh. 68).  Two hundred and twenty-seven trip sheets reference Daniel F.'s ambulatory abilities.  (Govt's Exh. 78A).  Advantage altered at least one of Daniel F.'s CMNs to falsely represent that he could not sit in a wheelchair.  (Govt's Exh. 91, 91a).  In addition, Daniel F. was transported by wheelchair van 25 times between July 2009 and August 2010. (Govt's Exh. 43(H)).

Dr. James Thompson ("Dr. Thompson") testified that he treated Daniel F. and determined that ambulance transportation for dialysis was medically necessary.  (Doc. 142 at 77).  Dr. Thompson testified that Daniel F. was a diabetic double amputee with renal disease who previously suffered a heart attack.  (Doc. 142 at 76-77).  Dr. Thompson also authenticated a September 17, 2010, letter written by him chronicling Daniel F.'s previous heart attack and MRSA infection.  (Id. at 78-79; Deft's Exh. 3).  Dr. Thompson also authenticated five CMNs for Daniel F. (Deft's Exh. 4).  Dr. Thompson explained on cross-examination that Daniel F. "was

18

one of the sickest patients in my practice" and that determining whether ambulance transport was necessary for him was "a judgment call." (Doc. 142 at 83-84). Dr. Duncan further confirmed Dr. Thompson's testimony. (Doc. 141 at 197-98; Deft's Exh. 1).

Based on Dr. Thompson's testimony, the court will not incorporate Daniel F.'s ambulance transports when calculating the final loss amount.

### d.     Doris P.

Advantage transported Doris P. 190 times between August 28, 2010 and June 13, 2011. (Govt's Exh. 69). Seven EMTs opined that she was capable of safe transport by wheelchair van. (Govt's Exh. 68). Eight trip sheets reference Doris P.'s ambulatory capabilities, and she went to two Medicare-paid doctor's office visits in December 2010 and February 2011 without ambulance transport. (Govt's Exh. 78A, 43(Q)).

Dr. Ulrich testified that he was Doris P.'s treating physician and that her ambulance transport was medically necessary. (Doc. 142 at 41-56). Dr. Ulrich testified that Doris P. was a Type II diabetic with renal failure who required ambulance transport because of her frailty. (Id. at 51). Dr. Ulrich also stated that Doris P. developed a "foot drop," which means that Doris P. lost the use of one of her feet. (Id. at 42-44).

Based upon a review of Dr. Ulrich's testimony, the court concludes that ambulance transport of Doris P. was medically necessary and the court will not include the amounts paid for her transport in the loss amount.

c.      *Joel R.*

Advantage transported Joel R. by ambulance 121 times between May 5, 2010, and October 15, 2010.  (Govt's Exh. 69).  Seven EMTs opined that ambulance transport was not medically necessary for Joel R.  (Govt's Exh. 68).  Twenty-five trip sheets reference Joel R.'s ambulatory abilities, and Joel R. went to 15 Medicare-paid doctor's office visits between June and September 2010 without ambulance transport.  (Govt's Exh. 78A, 43(R)).  Joel R.'s widow indicated that she drove Joel R. to his doctor's appointments, and Joel R. was transported by wheelchair van once in October 2010.  (Govt's Exh. 112, 43(R)).

Dr. Maurice Lewis ("Dr. Lewis") testified that he treated Joel R. for approximately 40 years.  (Doc. 141 at 168-77).  He testified that Joel R. suffered from renal failure, coronary artery diseases, three vessel disease, cardiac arryhthmias, vascular heart disease, aortic valvular disease, and peripheral neuropathy.  (Id. at 170).  Dr. Lewis testified that Joel R. became so weak that ambulance transportation was necessary.  (Id. at 172).  Dr. Lewis explained that Joel R. needed ambulance transportation even though he was ambulatory because of his various medical conditions.  (Id. at 173-74).

Dr. Duncan also testified concerning Joel R.'s need for ambulance transport.  (Doc. 141 at 209, 210; Deft's Exh. 1).  Additionally, Dr. Cary Cummings, III ("Dr. Cummings") authenticated three CMNs for Joel R. in his affidavit.  (Deft's Exh. 5).

The court credits Dr. Lewis' and Dr. Duncan's testimony.[19]  The court will not consider Joel R.'s ambulance transports in its loss amount calculations.

           *e.*     *James R.*

Advantage transported James R. 367 times between October 17, 2009 and December 17, 2010.  (Govt's Exh. 68).  15 EMTs identified James R. as capable of safe wheelchair van transport.  (Govt's Exh. 68).  Two hundred and ninety-eight trip sheets referenced James R.'s ambulatory abilities, and two of James R.'s trip sheets were altered in connection with the August 2010 audit.  (Govt's Exh. 73, 78A). James R. also went to 30 Medicare-paid doctor's office visits between October 2009 and December 2010 without ambulance transport.  (Govt's Exh. 43(S)).  James R.'s widow stated that she drove him to his appointments and that initially, he would walk outside where the Advantage EMTs would place him on their stretcher.  Later, the EMTs transferred James R. inside his home.  (Govt's Exh. 113).

Dr. Augustus Papandrea ("Dr. Papandrea") testified concerning his treatment of James R.  (Doc. 142 at 97-108).  He testified that James R. suffered from heart disease, Parkinson's, morbid obesity, hypertension, and eventually, renal failure.  (Id. at 98).  Dr. Papandrea testified that James R. was unstable, prone to falling, and sometimes unable to maintain a sitting position.  (Id. at 100).  Due to

---

[19] The government emphasizes that Dr. Lewis stated he only visited Joel R. at his home during 2010, even though the government has records of doctor's office visits from that year.  (Doc. 143 at 24-25).  Thus, the government indicates that Dr. Lewis' recollection may be suspect.  However, Dr. Lewis was unequivocal concerning the need for Joel R.'s ambulance transport, and the court finds him to be quite credible on the matter.

James R.'s heart disease, Dr. Papandrea was concerned that James R. may faint, have extremely low blood pressure, or have extreme fatigue after dialysis. (Id.) Dr. Papandrea agreed on cross-examination that if James R. was safely strapped in, he could have been transported by wheelchair van, but reiterated his concerns about James R.'s unstable medical condition. (Id. at 107).

Dr. Duncan also testified concerning the medical necessity of ambulance transport for James R. Upon a review of James R.'s medical records from 2008 to 2010, Dr. Duncan stated that James R. only required ambulance transport approximately 15% of the time. (See Deft's Exh. 1). Dr. Duncan identified several time periods when James R. required ambulance transport, but all of these time periods were prior to when Advantage began transporting him. (See Doc. 141 at 204-208). When questioned concerning this point on cross-examination, Dr. Duncan attempted to explain that the percentage of times where ambulance transport would have been necessary was higher if he had only looked at the necessity of ambulance transportation between October 2009 and December of 2010. (Id. at 237-39). However, unlike his analysis of Doris B. discussed *supra*, this explanation is contradicted by his earlier testimony that only highlighted the necessity for ambulance transport for incidents that occurred prior to October 2009.

The court credits Dr. Papandrea's concerns about James R.'s medical condition, but must also consider Dr. Papandrea's testimony concerning the viability of wheelchair van transport and Dr. Duncan's testimony implying that ambulance transport was not necessary between October 2009 and December 2010.

The court considered the entirety of this conflicting testimony and determined that it will include a portion of the cost of James. R.'s tranports into the loss amount. Based on this evidence, the court will incorporate 50% of the value of James R.'s ambulance transport, or $34,456.50, in the loss amount.

> *f.* *Ronald S.*

Advantage transported Ronald S. by ambulance 105 times between December 1, 2010, and May 11, 2011. (Govt's Exh. 69). Six EMTs opined that he could have been safely transported by wheelchair. (Govt's Exh. 68). Moreover, Ronald S.'s name appeared on the "Patients Who Can Go By Wheelchair Van" list and 44 trip sheets referenced his use of a wheelchair. (Govt's Exh. 54, 78A). Ronald S. was transported by wheelchair van five times in January and April of 2011, including twice by Advantage. (Govt's Exh. 43(T)). Ronald S. went to four Medicare-paid, doctor's office visits between February and May of 2011 without ambulance transport, and records indicate that he could self-propel his wheelchair at the Golden Living Center. (Govt's Exh. 43(T), 44(D)).

Dr. Thomas Kunkle ("Dr. Kunkle") testified that he treated Ronald S. at Golden Living Center. (Doc. 142 at 6-13). Dr. Kunkle stated that ambulance transport was necessary for Ronald S. due to his congestive heart failure, shortness of breath, recurrent infections, and history of seizures. (Id. at 8-9). Dr. Kunkle agreed that Ronald S. could propel himself in a wheelchair but nevertheless insisted that ambulance transport was necessary. (Id. at 10-13). Dr. Duncan confirmed Dr. Kunkle's conclusion. (Doc. 141 at 218-22).

23

The court credits Dr. Kunkle and Dr. Duncan's testimony and will not consider the ambulance transports of Ronald S. in the loss amount.

> g.    *William S.*

Advantage transported William S. 299 times between May 14, 2010, and July 27, 2011.  (Govt's Exh. 69).  Six EMTs identified William S. as capable of safe wheelchair van transport.  (Govt's Exh. 68).  William S.'s name appears on the "Patients Who Can Go By Wheelchair Van" list.  (Govt's Exh. 54).  Fifty-six trip sheets reference William S.'s ambulatory abilities.  (Govt's Exh. 78A).  William S. went to 22 Medicare-paid, doctor's office visits between May of 2010 and June of 2011 and William S.'s son confirmed that his family drove him to the appointments. (Govt's Exh. 43(U), 113).  Advantage also transported William S. by wheelchair van six times from May to July of 2011.  (Govt's Exh. 43(U)).

Dr. Reza G. Azizkhan ("Dr. Azizkhan") testified concerning his treatment of William S.  (Doc. 141 at 152-68).  Dr. Azizkhan testified that William S. suffered from diabetes, renal disease, severe peripheral vascular disease, chronic pain, hypertension, and hyperlipidemia.  (Id. at 153-54).  Dr. Azizkhan testified that ambulance transport became necessary for William S. in approximately 2010 because William S.'s medical condition became unstable and William S. was uncomfortable in a wheelchair.  (Doc. 141 at 157-58).  Dr. Azizkhan also testified credibly that William S.'s ability to ambulate did not alter his opinion that ambulance transport was medically necessary.  (Id. at 158).  Dr. Duncan confirmed Dr. Azizkhan's analysis.  (Doc. 141 at 182-85).

Based on the testimony of Dr. Azizkhan and Dr. Duncan, the court will not consider the ambulance transports of William S. in its loss amount.

### 3.   Treating Physician Affidavits

Several treating physicians did not comply with defendants' subpoenas compelling their testimony at trial and instead filed letters or affidavits concerning the medical necessity of their patients' ambulance transports.[20]

### a.   *Sandra Ba.*

The government asserts that the loss amount should include the 709 ambulance transports of Sandra Ba. between May 31, 2009 and October 25, 2011. (Govt's Exh. 69).  Fifteen EMTs identified Sandra Ba. as being capable of safe transport by wheelchair van.  (Govt's Exh. 68).  Four hundred and forty-eight trip sheets document Sandra Ba.'s consistent use of a wheelchair.  (Govt's Exh. 78A). Further, Sandra Ba.'s name appeared on the "Patients Who Can Go by Wheelchair Van" list.  (Govt's Exh. 54).  Notably, another transportation company transported Sandra Ba. 57 times by wheelchair van during this same time period.  (Govt's Exh. 43(A)).  Sandra Ba. stated in her interview that her family routinely drove her to

---

[20] The court recognizes that the government did not have an opportunity to cross-examine these physicians.  However, as discussed *supra*, defense counsel also did not have an opportunity to cross-examine the EMTs upon whose grand jury testimony the government's case is primarily based.  The court reviewed the letters and affidavits from these physicians and determined that the documents were sufficiently complete and reliable for the court to consider them in the calculation of the loss amount.

restaurants and stores while Advantage ambulances transported her to dialysis. (Govt's Exh. 112).

Dr. Duncan testified that ambulance transport was necessary for Sandra Ba. (Doc. 142 at 192-94; Deft's Exh. 1). Dr. Duncan explained that Sandra Ba. had diabetes, peripheral vascular disease, and recurrent cellulitis. (Id.) He explained that Sandra Ba. was morbidly obese, and that her right leg was amputated above the knee. (Id.) He also cited her gait abnormalities, weakness, balance issues, and fall problems. (Id.) By affidavit, Dr. Cummings authenticated one CMN for Sandra Ba. (Deft's Exh. 5).

By itself, Dr. Cummings' affidavit would not satisfy defendants' burden of production to counter the government's significant evidence concerning Sandra Ba. Dr. Cummings did not elaborate on Sandra Ba.'s medical condition or explicitly state in his affidavit that ambulance transportation was medically necessary for her. (See Deft's Exh. 5). However, Dr. Duncan's report and testimony is sufficient for the court to find that ambulance transportation of Sandra Ba. was medically necessary.

       *b.*    *Joanne O.*

Advantage transported Joanne O. 143 times from October 27, 2010 to May 16, 2011. (Deft's Exh. 69). Four EMTs identified Joanne O. as being capable of safe transport by wheelchair van. (Govt's Exh. 68). She was transported by wheelchair van eight times during this period, and went to six Medicare-paid doctor's office visits without ambulance transport. (Govt's Exh. 43(P)).

26

Dr. Jonathan Diamond ("Dr. Diamond") submitted an affidavit to the court explaining that he believed ambulance transport was medically necessary for Joanne O. (Doc. 131-1). He explained that "the patient's blood pressure would have wide fluctuations to the point where she could not sit upright and have blackouts; she needed to use oxygen and needed someone more skilled to monitor her; she did not tolerate dialysis well and she was very fragile." (Id.) He further explained that before dialysis, Joanne O. experienced breathing difficulties, and after dialysis, she often had lower blood pressure than normal, which did not facilitate her sitting upright. (Id.)

The court finds that the ambulance transports of Joanne O. were medically necessary and that her transports should not be included in the loss amount.

> d. *Walter T.*

Advantage transported Walter T. via ambulance 519 times between January 18, 2010 and October 21, 2011. (Govt's Exh. 69). Thirteen EMTs identified Walter T. as being capable of safe transport by wheelchair van. (Govt's Exh. 68). One hundred and seventy-one trip sheets referenced Walter T.'s ambulatory abilities. (Govt's Exh. 78A). Walter T. also went to 15 Medicare-paid doctor's office visits in 2010 without ambulance transport. (Govt's Exh. 43(V)). Walter T.'s son stated that he often drove his father to his doctors' appointments and explained that when Advantage first started picking up Walter T., Walter T. would walk outside and climb onto the stretcher. (Govt's Exh. 112). The government presented clear evidence that Advantage altered five of Walter T.'s CMNs. (Govt's Exh. 94-98a).

27

The government also emphasizes that Walter T. only had a two mile commute to his dialysis treatment center.  (Govt's Exh. 77).

Dr. Duncan testified that Walter T. suffered from arthritis and gout and had an increased fall risk.  (See Doc. 141 at 191-92; Deft's Exh. 1).  He also suffered from a myocardial infarction, cardiomyopathy, atrial flood, and iron deficiency anemia.  (Id.)  Walter T. had diabetes, hypertension, diverticulitis, and hypercholesterolemia.  (Id.)  Dr. Cummings also authenticated three of Walter T.'s CMNs.  (Deft's Exh. 5).

As discussed *supra*, Dr. Cummings' affidavit is not sufficient on its own, but coupled with Dr. Duncan's testimony and report, the court concludes that ambulance transport of Walter T. was medically necessary.

> e.      *Myra T.*

Advantage transported Myra T. 319 times via ambulance from April 5, 2010 to October 14, 2011.  (Deft's Exh. 69).  Nine EMTs opined that Myra T. was capable of safe transport by wheelchair van.  (Govt's Exh. 68).  She had 11 Medicare-paid doctor's office visits.  (Govt's Exh. 43(W)).  In an interview with an FBI Agent, Myra T. stated that her son or other family members drove her to doctor appointments and other places like church.  (Govt's Exh. 112).

Dr. Diamond's affidavit also addressed his treatment of Myra T.  (Doc. 131-1).  Dr. Diamond stated that ambulance transport was medically necessary for Myra T. because she had a high amputation on her leg without a prosthesis, often required oxygen, and frequently complained of chest pains.  (Id.)

Based on Dr. Diamond's affidavit, the court finds that defendants have satisfied their burden of production and that the ambulance transports of Myra T. will not be considered for purposes of the loss amount.

    *f.*  *Richard W.*

Advantage transported Richard W. via ambulance 381 times between September 19, 2008 and July 14, 2010.  (Govt's Exh. 69). 295 trip sheets contained references to Richard W.'s ambulatory abilities.  (Govt's Exh. 78A).  Richard W. was transported by wheelchair van six times and went to nine Medicare-paid doctor's office visits without ambulance transport during this time period.  (Govt's Exh. 43(Z)).

Dr. Duncan endeavored to render an opinion on the medical necessity of ambulance transport for Richard W., but determined that the medical records were too "scanty" to come to any conclusion.  (Doc. 141 at 218).  After the evidentiary hearing, Dr. Jack H. Moody ("Dr. Moody") and Dr. Charles D. Gerlach ("Dr. Gerlach") filed letters with the court indicating that they were Richard W.'s treating physicians and opining that ambulance transport was medically necessary in his case.  (Docs. 132, 133).  Both doctors stated that Richard W.'s health was "extremely poor" and that he had "extremely severe peripheral vascular disease, kidney failure, and bilateral lower extremity amputations."  (Id.)  The doctors note that Richard W. had no other means of transportation and that he was unable to drive a motor vehicle.  (Id.)

The court finds the letters filed by Dr. Moody and Dr. Gerlach to be

persuasive, and will not consider Advantage's transports of Richard W. when

computing the loss amount.

4.      Dr. Duncan Testimony

As discussed *supra*, Defendants' expert witness, Dr. Duncan, reviewed the

medical records of multiple beneficiaries to determine if ambulance transport was

medically necessary.  However, the defense's case regarding the medical necessity

of ambulance transports for Jane F. and Reginald H.[21] relies almost solely on Dr.

Duncan's opinion and testimony.

a.      *Jane F.*

The government established that Advantage transported Jane F. for dialysis

treatments via ambulance 425 times between September 4, 2007 and June 30, 2010.

(Govt's Exh. 69).  Seven EMTs opined that Jane F. could have been safely

transported by wheelchair van. (Govt's Exh. 68).  The government presented 108

trip sheets and assisted living center records that reference Jane F.'s ambulatory

abilities.  (Govt's Exh. 78A, 44(C)).  Importantly, Jane F. was transported by

wheelchair van six times between January and May of 2010, including two

transports by Advantage.  (Govt's Exh. 43(G)).

Dr. Duncan's report concludes that Jane F. required ambulance

transportation for all medical visits including dialysis.  (Deft's Exh. 1).  Dr. Duncan

---

[21] The government is seeking a combined loss amount of $128,187 from
Advantage's ambulance transports of Reginald H. and Jane F.  (Doc. 143 at 26).

testified that Jane F. suffered from cerebral vascular disease, diabetes with polyneuropathy, and depressive disorder.  (Doc. 141 at 216).  She was certified for skilled nursing care multiple times in the Spring of 2010 and ultimately had a bypass graft to the leg, which makes walking challenging.  (Id. at 217).  Dr. Duncan's conclusion leads the court to determine that ambulance transport of Jane F. was medically necessary.

> b.   *Reginald H.*

The government's evidence indicates that Reginald H. was transported 289 times by ambulance for dialysis between May, 2009 and April, 2010.  (Govt's Exh. 69).  However, seven Advantage EMTs identified Reginald H. as being capable of safe transport by wheelchair van.  (Govt's Exh. 68).  The government recovered over 300 trip sheets documenting Reginald H.'s ambulatory abilities.  (Govt's Exh. 78A).

Dr. Duncan testified that ambulance transport was medically necessary for Reginald H. for all medical visits and dialysis.  (Doc. 141 at 200-202).  Dr. Duncan indicates that Reginald H. had diabetes, renal failure, hypertension, peripheral vascular disease, and heart disease.  (See Deft's Exh. 1; Doc. 141 at 200-202).  Reginald H. had undergone a kidney transplant and leg amputations.  (Id.)  He had previously suffered from both a heart attack and a stroke.  (Id.)  Thus, the court concludes that defendants have produced significant evidence to defeat the government's *prima facie* case concerning the medical necessity of ambulance transports for Reginald H.

The court will not consider the payments Medicare made to Advantage for the ambulance transport of Jane F. or Reginald H. when determining the loss amount.

### C.      Loss Amount Summary

The court concludes that Advantage and Sivchuk should be responsible for a loss amount of $968,201.50.  This number is composed of $820,835 for the 11 beneficiaries for whom defendants did not present evidence, $105,570 for 50% of Doris B.'s transports, $7,340 for Sandra Bo.'s transports, and $34,456.50 for 50% of James R.'s transports.  This loss amount results in a 14-level increase to defendants' base offense levels of six.  U.S.S.G. § 2B1.1(b)(1)(H).

Defendants assert that the loss amount should be reduced by the payment Medicare would have had to provide Advantage for wheelchair transport of the beneficiaries involved.  (Doc. 144 at 9, 13, 29).  Defendants cite Application Note 3(E)(i) of U.S.S.G. § 2B1.1, which provides that the loss amount shall be reduced by "the fair market value of . . . the services rendered, by the defendant . . . to the victim before the offense was detected."  Unfortunately, defendants have failed to provide the court with the appropriate methodology to calculate this amount: the record is silent as to if, how much, at what rate, or under what circumstances Medicare would have paid for wheelchair transports.[22]  Defendants also fail to

---

[22] Indeed, the government has previously represented that Medicare does not pay any benefit whatsoever for wheelchair transport.  (Doc. 122 at 7 ("Medicare does not pay *any* benefit for the transport of a beneficiary by wheelchair van.") (emphasis in original)).

submit any proposed value of services rendered or factually support such a figure.

See United States v. Borrasi, 639 F.3d 774, 783-84 (7th Cir. 2011) (finding that the

defendant did not refute the government's *prima facie* case with evidence of the fair

market value of services rendered); United States v. Read, 710 F.3d 219, 229-30 (5th

Cir. 2012) (rejecting defendants' argument that the loss amount should be off-set by

the value of the "real work" performed).  In light of the paucity of valuation

evidence, the court is unable to estimate the equivalent value of wheelchair

services.  The court concludes that there is no basis for an off-set to the loss amount

under § 2B1.1 (Application Note 3(E)(i)).  Therefore, the court finds that a loss

amount of $968,201.50 is appropriate.

IV.    **Conclusion**

For the foregoing reasons, the court finds a loss of amount of $968,201.50,

which provides for a 14-level increase in defendants' offense levels.  See U.S.S.G.

§ 2B1.1(b)(1)(H).  The court will calculate defendants' final guidelines ranges,

including a determination of whether enhancements for sophisticated means and

aggravated role apply to Sivchuk pursuant to § 2B1.1(b)(10)(c) and § 3B1.1(c), rule

on any motions for departure, and consider the 18 U.S.C. § 3553(a) factors on the

record at sentencing.  An appropriate order follows.


 /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:      March 5, 2014