## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:12-CR-004** |
| | : | |
| **v.** | : | **(Chief Judge Conner)** |
| | : | |
| **ADVANTAGE MEDICAL** | : | |
| **TRANSPORT, INC. and SERGE** | : | |
| **SIVCHUK** | : | |

## MEMORANDUM

The court held an evidentiary hearing in the above-captioned case on November 12 and November 13, 2013 concerning the loss amount to be attributed to defendants Advantage Medical Transport, Inc. ("Advantage") and Serge Sivchuk ("Sivchuk") for their participation in Medicare fraud. (Docs. 141-42). Following the production of additional evidence, the court conducted an additional evidentiary hearing from March 31 through April 2, 2015. (Docs. 229-31). For the following reasons, the court finds that a loss amount of $194,378.50 is appropriate.

I.   **Background**[1]

Advantage was a licensed ambulance transport company in Harrisburg, Pennsylvania. Sivchuk served as its director, president, and managing employee. Advantage typically transported patients to and from dialysis treatment centers and submitted Medicare claims for those transports.

Medicare covers non-emergency ambulance transport if it is a "medical necessity." A "medical necessity" exists if (1) the beneficiary is bed-confined, and

_____

[1] The court's findings are based upon the court's assessment of the credibility of the testimony and information provided at the evidentiary hearings.

other means of transportation are contraindicated; or (2) the beneficiary's medical condition, regardless of bed confinement, requires medical transport.  42 C.F.R. § 410.40(d)(1).  A beneficiary is "bed-confined" if the beneficiary (1) is unable to get up from bed without assistance; (2) is unable to ambulate; or (3) is unable to sit in a chair or wheelchair.  Id.  Bed confinement is only one factor among many in determining medical necessity.  Id.

For non-emergency, scheduled, repetitive ambulance services, the ambulance provider must obtain a Certificate of Medical Necessity ("CMN") from the beneficiary's attending physician certifying that medical necessity requirements are satisfied.  Id. § 410.40(d)(2).  A CMN must be no older than sixty days at the time of transport.  Id.  The presence of a signed CMN does not by itself validate the medical necessity of ambulance transport.  Id.

After each transport, the attending Advantage Emergency Medical Technician ("EMT") would complete and sign a trip sheet, which contains pertinent details about the patient and the transport.  The ambulance driver would also sign this sheet.  Advantage kept these records at its office.

In August 2010, Highmark, the third-party contractor that handles Medicare claims in Pennsylvania, notified Advantage that it would be conducting an audit of Advantage's claims.  Highmark selected Advantage for review because its billings for dialysis transports were higher than its peer group.  The notice directed Advantage to submit all supporting documents, including trip sheets, for 40 dialysis transports of 7 patients conducted in August 2010.

Fourteen of the 40 trip sheets contained references to the beneficiary's ambulatory abilities.  Sivchuk, along with David Paul ("Paul"), an Advantage EMT, and Vlade Panchenko ("Panchenko"), an Advantage administrative assistant, instructed the EMTs to re-write the 14 trip sheets to omit all such references.  Some EMTs re-wrote their trip sheets, and Paul and Panchenko re-wrote the rest and forged the EMTs' signatures.  Sivchuk submitted the trip sheets, along with the additional requested documentation, to Highmark, which approved all 40 claims.

On June 2, 2011, agents conducted a search of Advantage's office.  In addition, agents interviewed 26 former Advantage EMTs.  (See Gov't Exhs. 113, 113(A)).  The EMTs identified 26 beneficiaries who could have been safely transported to dialysis without ambulance transport.  (See Gov't Exh. 68).

On January 11, 2012, a federal grand jury indicted Sivchuk and Advantage with 14 counts of Health Care Fraud, pursuant to 18 U.S.C. § 1347 (Counts 1-14).  (Doc. 1).  The grand jury also charged Sivchuk with 14 counts of False Statements in Health Care Matters, pursuant to 18 U.S.C. § 1035 (Counts 15-28), and Conspiracy (Count 29).  (Id.)

On February 22, 2013, Sivchuk pleaded guilty to Count 15, a false statements count.  (Doc. 97).  On May 1, 2013, Advantage pleaded guilty to a Superseding Information (Doc. 103) charging it with 14 false statements counts.  (Doc. 108).

The United States Probation Office conducted a presentence investigation and prepared presentence reports for both Advantage and Sivchuk.  The presentence reports recommend a loss amount of $740,310, based on 4670 trip sheets that referenced the ambulatory abilities of the 26 beneficiaries identified by

3

the EMTs as individuals who did not need ambulance transport.[2]  Based on this computation, the probation officer adds a 14-level increase to both Sivchuk and Advantage's base offense level of 6, pursuant to U.S.S.G. § 2B1.1(b)(1)(H).  The probation officer also calculates Advantage's Guidelines fine range, $592,248 to $1,184,496, using this loss amount.

On November 12 and 13, 2013, the court held an evidentiary hearing to determine the amount of loss attributable to Sivchuk and Advantage.  (Docs. 141-42).  The government called FBI Special Agent Richard Oh ("Agent Oh"), who outlined the government's investigation of Advantage and Sivchuk.  The government introduced several exhibits through Agent Oh, including evidence of altered trip sheets and CMNs, Advantage and Sivchuk's efforts to control the content of the trip sheets, and the ambulatory abilities of the 26 beneficiaries. (Doc. 141 at 8-120; Doc. 142 at 27-41).

Nicole Watson ("Ms. Watson"), a Certified Public Accountant, testified concerning her analysis of Medicare's payments to Advantage between 2008 and 2011 for the ambulance transport of the 26 beneficiaries.  (See Doc. 141 at 120-37; Gov't Exhs. 69, 75).  Lisa Small, a Medicare contract fraud investigator, testified regarding the pre-payment and stop payment options Medicare could have exercised had it learned of Sivchuk's fraud through the August 2010 audit. (Doc. 141 at 137-51).

---

[2] The government later asserted that it mistakenly reported to the Probation Office that 4670 trip sheets referenced the beneficiaries' ambulatory abilities when in fact the correct number is 3776 and the corresponding loss amount is $741,054. (Doc. 122 at 13 n.11).

Defendants called an expert witness, Dr. Ralph E. Duncan ("Dr. Duncan"), to testify concerning whether ambulance transports for several of the 26 beneficiaries were medically necessary. (Doc. 141 at 177-250). Defendants also called a number of treating physicians, who testified regarding the medical necessity of ambulance transports for their patients. (Doc. 136, Exhs. 2, 3, 4; Doc. 141 at 152-77; Doc. 142 at 6-27, 41-119). Multiple physicians testified that transportation by ambulance may be necessary even in cases where the patient is ambulatory, depending upon the patient's overall medical condition. (See, e.g., Doc. 141 at 158). Four physicians were unable to testify, but filed affidavits with the court detailing their opinions concerning the medical necessity of ambulance transports for their patients. (See Docs. 131-33, 136).

The court directed the parties to file supplemental memoranda addressing their respective proposed loss amounts. Therein, the government asserted that the loss amount should be $1,821,661 for 9432 ambulance transports of the 26 beneficiaries between 2007 and 2011, regardless of whether the corresponding trip sheets referenced the patient's ambulatory abilities.[3] (Doc. 143 at 2). Conversely, Advantage and Sivchuk argued that the loss amount should be based on the transports for the 14 trip sheets that they accepted responsibility for altering, which would result in a loss amount of $2,939.27 and no increase to their base offense levels. (Doc. 144 at 5); see U.S.S.G. § 2B1.1(b)(1)(A).

---

[3] In the government's initial sentencing memorandum, it posited that the loss amount should be $1,821,321 for 9430 transports. (Doc. 122 at 17). However, the government adjusted these figures—to $1,821,661 for 9432 transports—during the first evidentiary hearing. (Doc. 143 at 2).

The court found that the government had established, by a preponderance of the evidence, a *prima facie* case of a loss amount of $1,821,661. (Doc. 145 at 12). The court further held that defendants successfully refuted the government's *prima facie* case for 12 of the 26 beneficiaries. (Id. at 18-32). As a result, the court concluded that defendants were responsible for a loss amount of $968,201.50. (Id. at 32). This number comprised $820,835 for 11 beneficiaries for whom defendants presented no evidence, $105,570 for 50% of Doris B.'s transports, $7,340 for Sandra Bo.'s transports, and $34,456.50 for 50% of James R.'s transports.[4] (Id.)

Thereafter, defendants moved the court to continue sentencing and to direct the production of medical records pertaining to the 11 beneficiaries for whom no evidence was presented at the evidentiary hearing. (Doc. 156). The court granted defendants' motion, issuing subpoenas *duces tecum* to medical providers of the 11 beneficiaries, pursuant to Federal Rule of Criminal Procedure 17(c). FED. R. CRIM. P. 17(c); (Doc. 157). Following the production of extensive documentary evidence, the court scheduled a second evidentiary hearing to determine whether ambulance transports for the 11 beneficiaries were medically necessary. (Doc. 213). Both parties submitted expert witness reports in advance of the proceeding.

The second hearing took place from March 31 through April 2, 2015. (Docs. 229-31). Therein, the parties proffered wholly divergent views of the evidence. Defendants called Dr. Duncan as an expert witness, who opined that ambulance transport to and from dialysis during the relevant time period was medically

---

[4] In an effort to protect the beneficiaries' identities, the court employs the first name and last initial of each beneficiary throughout this opinion.

necessary for each of the 11 beneficiaries.[5]  In forming his opinions, Dr. Duncan

limited his review to the subpoenaed medical records; he did not consult ambulance

trip sheets or physician affidavits.  (See Doc. 232 at 8).  Defendants introduced

numerous exhibits through Dr. Duncan, including medical records for the 11

beneficiaries and affidavits submitted by treating physicians for 7 of the 11

beneficiaries.

The government called Dr. Debra L. Patterson ("Dr. Patterson") as an expert

witness.  Counterpoising Dr. Duncan's testimony, Dr. Patterson posited that the

ambulance transports at issue were not medically necessary, with the exception of

10% of Vivian M.'s transports.  (Gov't Exh. 141).  Dr. Patterson reviewed medical

records, trip sheets, treating physician affidavits, and additional investigatory

records provided by the government to draw her conclusions.  (Doc. 230 at 46-47).

The government also called Ms. Watson, who testified that Medicare denied

approximately $37,576 of Advantage's dialysis transport claims while the company

was subject to pre-payment review.  (Doc. 231 at 56-62; Gov't Exh. 129; see Gov't

Exh. 128).  Ms. Watson attempted to explain that this calculation was based on 181

transports of 10 dialysis patients.  (Doc. 231 at 56-60).  When questioned concerning

this point on cross-examination, Ms. Watson was unable to identify the 10 patients

by name or to provide an itemization of the ambulance transports undergirding her

conclusions.  (Id. at 65-66).  Ms. Watson asserted that at least 1 of the 10 patients was

from among the group of 11 beneficiaries under review at the hearing.  (Id. at 65).

---

[5] Specifically, Dr. Duncan estimated that 80% of Josephine H.'s transports;
85% of Michael M.'s transports; 50% of David T.'s transports; and 100% of the
remaining 8 beneficiaries' transports were medically necessary.  (Def. Exhs. 1-11).

At the conclusion of the proceedings, the government asserted that the proper loss amount to be applied to the 11 patients is $817,736. (Doc. 231 at 80; Gov't Exh. 144). The government further asserted that defendants are responsible for an intended loss of $37,576 stemming from the Medicare claims which were denied during pre-payment review. (Doc. 231 at 65, 79-80; Gov't Exh. 144). In total, incorporating the court's findings from the first evidentiary hearing, the government argues that the appropriate loss amount is $1,002,678. (Doc. 231 at 65; Gov't Exh. 144).

Subsequent to the hearing, defendants filed a supplemental memorandum, wherein they contend that the loss amount for each of the 11 beneficiaries should be zero. (Doc. 232 at 1). Defendants argue generally that the testimony and evidence presented at the hearing established (1) that travel to and from dialysis treatment presents unique medical considerations,[6] (id. at 4-6); (2) that EMTs are not qualified

---

[6] Dr. Duncan testified that prior to undergoing dialysis treatments, patients are often hypertensive—experiencing abnormally high blood pressure—and that following dialysis, they are often hypotensive—experiencing abnormally low blood pressure. (Doc. 229 at 6-8). Consequently, patients are likely to feel weak and unsteady both before and after treatment. (Id.) As explained by one beneficiary's treating physician, "Patients get sicker before dialysis because of the accumulating fluids and toxins from kidney failure and electrolyte abnormalities, and potassium levels increase. After dialysis, the blood pressure drops and patients feel weak and light-headed." (Def. Exh. 6, Dr. Diamond Aff. ¶ 13). Multiple treating physicians expressed by affidavit that a patient's ability to travel by car or wheelchair van outside of the context of dialysis treatments would not have influenced their determination of medical necessity. (See, e.g., id., Dr. Vaddineni Aff. ¶ 14 ("If I were told that Ms. H., during the same time frame, had been able to go by car to doctor's office visits, I would still determine that she needed an ambulance for dialysis treatments.")).

to make medical necessity determinations,[7] (id. at 6-8); and (3) that treating physicians have personal knowledge and experience which allows them to offer optimal insight into patient condition.[8] (Id. at 8-9).  Defendants further aver that they are not responsible for any pre-payment claims submitted to Medicare because the government has presented no evidence in support of its submissions on this point.  (Id. at 29-32).  All of the above-referenced issues are ripe for disposition.

## II.  **Legal Standard**

In sentencing, a court must engage in a three-step process pursuant to Gall v. United States, 522 U.S. 38 (2007).  First, it must calculate the advisory Guidelines range.  United States v. Wright, 642 F.3d 148, 152 (3d Cir. 2011).  Second, the court must formally rule on any motions for departure and state the impact, if any, of

---

[7] According to Dr. Duncan, EMTs are unable to assess the medical necessity of ambulance transport because (1) they are not qualified medical professionals; and (2) their observations represent only "one small factor of the total picture, which includes [a patient's] basic disease or comorbidities . . . [and] their medication[s]." (Doc. 230 at 11).  Numerous treating physicians submitted analogous opinions by affidavit.  (See, e.g., Def. Exh. 1, Dr. Bell Aff. ¶ 14 ("The [EMTs'] opinions about the patient's need for an ambulance would not have made a difference in my determination about Mr. T.'s need for an ambulance because the EMTs do not have access to [the] patient's medical records and their knowledge of the patient's condition and medical history is limited as is their level of medical training and knowledge. . . . Doctors get a different impression from seeing a patient chronically and over time.")).

[8] Defendants assert that because the treating physicians' opinions are based upon "a more comprehensive understanding of the patient[s]," their affidavits "enhance[] or expand[] on [Dr. Duncan's] otherwise valid" testimony.  (Doc. 232 at 8).  The court recognizes that the government did not have an opportunity to cross-examine these physicians.  However, defense counsel also did not have an opportunity to cross-examine the EMTs upon whose grand jury testimony the government's case is primarily based.  The court has reviewed the submissions from these physicians and has determined that the documents are sufficiently complete and reliable for the court to consider them in the calculation of the loss amount.

such ruling on the Guidelines calculation.  Id.  Third, the court is required to exercise its discretion and consider the sentencing factors set forth in 18 U.S.C. § 3553(a), which may vary from the advisory Guidelines range.  Id.

Generally, the government bears the burden to prove any facts that may warrant a Guidelines enhancement by a preponderance of the evidence.  United States v. Ali, 508 F.3d 136, 143 (3d Cir. 2007).  Section 2B1.1(b)(1) of the Sentencing Guidelines provides for increases to a defendant's offense level based upon the amount of loss attributable to fraud.  U.S.S.G. § 2B1.1(b)(1).  "Loss" is defined as "the greater of actual loss or intended loss."  United States v. Diallo, 710 F.3d 147, 155 (3d Cir. 2013) (quoting U.S.S.G. § 2B1.1 cmt. 3(A)).  The loss amount is a specific offense characteristic, and thus, the government bears the burden of persuasion.  Id. at 151.  Once the government presents *prima facie* evidence of a given loss figure, the burden of production shifts to the defendant.  Id.  Determining an appropriate loss amount stemming from fraud is an exceedingly difficult task for the presiding court.  Thus, the court must only make a "reasonable estimate" of the loss amount based on the evidence.  Ali, 508 F.3d at 145 (quoting U.S.S.G. § 2B1.1 cmt. 3(C)).

## III.   **Discussion**

### A.    **Defendants' Production of Evidence for the 11 Beneficiaries**

As noted *supra*, the government previously presented *prima facie* evidence concerning the lack of medical necessity for ambulance transport of the 11

beneficiaries currently under review.[9]  The court will estimate a reasonable loss amount by examining defendants' rebuttal evidence regarding each of the 11 beneficiaries *seriatim*.

      1.    *Patricia C.*

     Advantage transported Patricia C. via ambulance 406 times between December 12, 2009 and March 28, 2011.  (Gov't Exh. 144).  Seventeen EMTs identified Patricia C. as being capable of safe wheelchair van transport.  (Gov't Exh. 120).  Patricia C.'s name appeared on the "Patients Who Can Go by Wheelchair Van List," and there were 326 trip sheets referencing her ambulatory abilities.  (Id.)  In an interview with an FBI Agent, Patricia C. stated that, during the time period within which she received ambulance transports from Advantage, she owned her own vehicle and was able to drive herself to the grocery store.  (Gov't Exh. 112).  She also traveled to doctor's office visits by wheelchair van and attended 30 Medicare-paid doctor's appointments without ambulance transport.  (Doc. 230 at 97; Gov't Exh. 120).

     Patricia C.'s general care physician, Dr. Steven Heckenluber ("Dr. Heckenluber"), submitted an affidavit stating that ambulance transport was medically necessary for Patricia C. 100% of the time.  (Def. Exh. 9, Dr. Heckenluber Aff. ¶ 11).  Dr. Heckenluber began treating Patricia C. in 2008.  (Id. ¶ 8).  He explained that he signed Patricia C.'s CMNs based on his consideration of her "multitude of medical problems, particularly her cardiac and pulmonary problems,

---

[9] The total amount Medicare paid to Advantage for the ambulance transport of these beneficiaries is $820,835.  (See Doc. 143 at 11; Gov't Exh. 144).

weakened debilitated state, seizure risk and morbidity and mortality problems."
(Id. ¶¶ 8-9). Dr. Heckenluber characterized Patricia C. as "an accident waiting to
happen." (Id. ¶ 9). In Dr. Heckenluber's opinion, Patricia C. required "someone
with skill to monitor her during transport." (Id.) He noted that Patricia C.'s ability
to ambulate, or lack thereof, was not the only factor undergirding his medical
necessity determination. (Id. ¶ 12).

Dr. Duncan corroborated Dr. Heckenluber's assessment of Patricia C. (Def.
Exh. 9). Dr. Duncan testified that Patricia C. suffered from end stage renal disease,
hypertension, diabetes, hypothyroidism, epilepsy, chronic obstructive pulmonary
disease, coronary artery disease, wasting, lymphoma, and colon cancer. (Doc. 229 at
14-15). Defendants introduced certain of Patricia C.'s medical records, including
two emergency room visit reports from June 2010 and February 2011. (Def. Exhs.
40, 41). According to these reports, Patricia C. required treatment for extreme pain
and deep vein thrombosis—potentially life-threatening blood clots. (Doc. 229 at
18-23).

Dr. Patterson testified that she saw no indication from Patricia C.'s medical
records or ambulance trip sheets that Patricia C. could not sit safely in a wheelchair
during transport to and from dialysis. (Doc. 230 at 92-93). Dr. Patterson noted that
on numerous occasions Patricia C. utilized a wheelchair both before and after
receiving dialysis treatment. (Id. at 93-97). Dr. Patterson also observed that
Patricia C.'s three-mile commute to her dialysis treatment center was relatively
short, requiring only a seven-minute drive. (Id. at 93). Dr. Patterson concluded that
none of Patricia C.'s transports were medically necessary. (Id. at 51).

The court is persuaded by Dr. Heckenluber's affidavit and Dr. Duncan's testimony and report, and the court finds that defendants have satisfied their burden of production. Thus, the ambulance transports of Patricia C. will not be considered for purposes of the loss amount.

### 2.   *Carol E.*

Advantage transported Carol E. 608 times between March 14, 2008 and October 24, 2011. (Gov't Exh. 144). Twenty EMTs testified in the grand jury that Carol E. could have been safely transported by a wheelchair van. (Gov't Exh. 120). Two hundred sixty-five trip sheets referenced Carol E.'s ambulatory capabilities, and 36 trip sheets cited her ability to sit in something other than a wheelchair. (Gov't Exhs. 120, 121). Carol E.'s name also appeared on the "Patients Who Can Go by Wheelchair Van List." (Gov't Exh. 120).

Dr. Duncan determined that Carol E. required ambulance transport 100% of the time. (Def. Exh. 10). He testified that Carol E. was unstable and fell frequently. (Doc. 229 at 23). Dr. Duncan explained that Carol E. suffered from a variety of disorders, including pressure ulcers; cardiovascular, respiratory, and endocrine problems; tegumentary pain; obesity; pneumonia; diabetes; end stage renal disease; chronic obstructive pulmonary disease; and congestive heart failure.[10] (Id. at 23-26). Dr. Duncan found that Carol E. required continuous oxygen monitoring during transports. (Id. at 25). Further, defendants introduced numerous medical records through Dr. Duncan, demonstrating a progressive decline in Carol E.'s heart

---

[10] Earlier in the hearing, Dr. Duncan testified that dialysis treatments could exacerbate comorbidities, such as heart failure, pulmonary edema, lung disease, cancer, and diabetes. (Doc. 229 at 12-13).

function before, during, and after her period of transport.  (Def. Exhs. 12-18; Doc.
229 at 26-37).  Included among these records was a hand-written note signed by
treating physician Dr. Herman Lawson ("Dr. Lawson") on June 28, 2010.  (Def. Exh.
16; see Def. Exh. 17).  The note reads: "[Carol E.] is essentially bed confined and
needs ambulance transportation to dialysis and other medical facility visits."  (Def.
Exh. 16).

Conversely, Dr. Patterson concluded that Carol E.'s ambulance transports
were not medically necessary.  (Doc. 230 at 51).  Specifically, Dr. Patterson opined
that Carol E.'s medical conditions, including her obesity, did not preclude Carol E.
from traveling by wheelchair van to dialysis appointments.  (Id. at 78-84).  Dr.
Patterson stated that she uncovered no evidence indicating that Carol E. required
oxygen monitoring on a routine basis.  (Id. at 79).  Dr. Patterson found it significant
that Carol E.'s dialysis treatment center was located only one mile from her
residence.  (Id. at 81).

Upon careful consideration of Dr. Duncan's testimony and report and Dr.
Lawson's note, the court concludes that ambulance transport of Carol E. was
medically necessary.

### 3. *Antoinette E.*

Advantage transported Antoinette E. by ambulance 214 times between
September 25, 2010 and June 2, 2011.  (Gov't Exh. 144).  Eight EMTs opined that she
was capable of safe transport by wheelchair van, and her name appeared on the
"Patients Who Can Go by Wheelchair Van List."  (Gov't Exh. 120).  The government

presented 87 trip sheets and assisted living records that made reference to Antoinette E.'s ambulatory abilities. (Gov't Exhs. 44(B), 120; Doc. 230 at 102-03).

Two treating physicians submitted affidavits opining that Antoinette E.'s ambulance transports were medically necessary. (Def. Exh. 8). Dr. Paul Williams ("Dr. Williams"), a general family practitioner, treated Antoinette E. for end stage renal disease, diabetes, and chronic obstructive pulmonary disease ("COPD") on a monthly basis from 2010 through 2011. (Id., Dr. Williams Aff. ¶ 5). In his affidavit, Dr. Williams states, "I determined that ambulance transport was medically necessary during the entire time she was in my care because [Antoinette E.] was a frail, elderly woman with a history of COPD and renal disease who weighed at most 120 lbs. [She] required continuous oxygen monitoring and was a difficult ambulator." (Id. ¶ 8). Dr. Julie Rothman ("Dr. Rothman") was Antoinette E.'s nephrologist from 2002 until her death in 2011. (Id., Dr. Rothman Aff. ¶¶ 6, 8, 9). Dr. Rothman treated Antoinette E. for congestive heart failure, liver failure, Hepatitis C, COPD, and polycystic renal disease. (Id. ¶ 6). According to Dr. Rothman's affidavit, "In September, 2010, [Antoinette E.] suffered from progressive and debilitating spinal stenosis, which required her to wear a full-body clam shell brace. . . . In my professional opinion she could not ambulate independently or sit in a wheelchair for transport, [and] additionally she was on measured oxygen for treatment of COPD and required medical assistance during transport." (Id. ¶¶ 13-14).

Dr. Duncan's testimony reinforced Dr. Williams and Dr. Rothman's representations. (Def. Exh. 8). Dr. Duncan also noted that Antoinette E.'s medical

15

records revealed episodes of lightheadedness, muscle weakness, dizziness, and impaired cognitive skills. (Doc. 229 at 38-39). During Dr. Duncan's testimony, defendants introduced a patient discharge summary dated June 19, 2011—the date of Antoinette E.'s death—which stated that Antoinette E.'s health had been "steadily deteriorating over the past year." (Def. Exh. 60; Doc. 229 at 45-46).

Dr. Patterson testified that she found no indication from Antoinette E.'s records that Antoinette E. required oxygen monitoring or that she wore a full-body clamshell brace. (Doc. 230 at 101-02). Dr. Patterson also observed that the activity records from Antoinette E.'s assisted living facility described her as "ambulating independently inside and outside of the facility as well as utilizing walkers . . . [and] being mobile in a wheelchair" between September 2010 and May 2011. (Id. at 103). Dr. Patterson concluded that Antoinette E.'s ambulance transports were not medically necessary. (Id. at 51).

The court finds Dr. Duncan's testimony and report, coupled with the affidavits filed by Dr. Williams and Dr. Rothman, to be persuasive. Hence, the court will not consider Advantage's transports of Antoinette E. when computing the loss amount.

### 4.   *Helen W.*

Advantage transported Helen W. 950 times between May 21, 2007 and November 3, 2010. (Gov't Exh. 144). Fourteen EMTs opined that Helen W. could have been safely transported by wheelchair van. (Gov't Exh. 120). Four hundred twenty-six trip sheets referenced Helen W.'s ambulatory abilities. (Id.) Forty-five of these trip sheets noted that Helen W. was able to stand freely, and 28 reported her

walking.  (Gov't Exh. 121).  Helen W. attended 33 Medicare-paid doctor's

appointments without ambulance transport during this time period.  (Gov't Exh.

120).  Moreover, Helen W.'s brother stated that she was only bedridden during the

final three months of her life.  (Gov't Exh. 112).

Dr. Duncan opined that all ambulance transports of Helen W. were medically

necessary.  (Def. Exh. 11).  Dr. Duncan testified that Helen W. was extraordinarily

ill; Helen W. experienced depression, blindness, gait dysfunction, dementia,

weakness, pneumonia, atrial fibrillation, and paralysis secondary to multiple

strokes.  (Doc. 229 at 47-50).  She suffered from coronary artery disease, end stage

renal disease, diabetes, and an infection resulting from a failed kidney transplant.

(Id.)  On at least two occasions during her period of transport, Helen W. went to the

emergency room following dialysis treatment.  (Id. at 53-55; Def. Exhs. 21, 29).

Dr. Duncan noted that Helen W. ultimately elected to discontinue dialysis knowing

that the decision would end her life.  (Doc. 229 at 47, 50).

During Dr. Duncan's testimony, defendants introduced records from Helen

W.'s treating nephrologist, Dr. Margaret Fitzsimmons ("Dr. Fitzsimmons").  (Def.

Exhs. 22, 23).  In a patient assessment dated July 9, 2007, Dr. Fitzsimmons reported

that Helen W. required a stretcher and a four-person lift to transfer to a

hemodialysis chair.  (Def. Exh. 22; Doc. 229 at 50-51).  Dr. Fitzsimmons observed

that Helen W. was "unable to keep [her]self stable for lift device use."  (Def. Exh. 22;

Doc. 229 at 50-51).  Additionally, in a CMN dated March 12, 2010, Dr. Fitzsimmons

stated as follows: "The patient is blind, status post multiple strokes, and eye issues

in setting of diabetes [sic] cannot get ready for dialysis independently.  Cannot walk

outside her home.  The ambulance crew needs to pick her up from inside her home and return her inside her home." (Def. Exh. 23; Doc. 229 at 56).

Through Dr. Patterson's testimony, the government introduced multiple trip sheets that described Helen W. as sitting in a wheelchair or walking. (Doc. 230 at 53-65; Gov't Exh. 142).  Dr. Patterson opined that Helen W.'s ambulance rides were not medically necessary because she was typically alert, oriented, and ambulatory, and she exhibited normal vital signs. (Doc. 230 at 51, 53-65).  Furthermore, Dr. Patterson noted that Helen W.'s commute to and from dialysis was only four miles, lasting approximately ten minutes. (Id. at 62; Gov't Exh. 120).

Based on Dr. Duncan's testimony and report and the medical records introduced at the hearing, the court concludes that defendants have produced significant evidence to defeat the government's *prima facie* case concerning the medical necessity of ambulance transports for Helen W.

###### 5.    *Vivian M.*

Advantage transported Vivian M. 138 times between January 12, 2011 and July 6, 2011. (Gov't Exh. 144).  Vivian M. traveled by wheelchair van twice during this time period. (Gov't Exh. 120).  Two EMTs identified Vivian M. as being capable of safe transport by wheelchair van, and 10 trip sheets referenced her ambulatory abilities. (Id.)

Dr. Duncan opined that 100% of Vivian M.'s ambulance transports were medically necessary. (Def. Exh. 3).  He testified concerning Vivian M.'s medical conditions, which included end stage renal disease, coronary artery disease, congestive heart failure, atrial fibrillation, a urinary tract infection, rib fractures,

and dementia.  (Doc. 229 at 61).  Dr. Duncan highlighted that Vivian M. fell on two separate occasions—January 5, 2011 and May 13, 2011.  (Id. at 62-67; Def. Exhs. 64-65, 71-72).  In each instance, Vivian M. was hospitalized and subsequently required extensive rehabilitative care.  (Doc. 229 at 62-67; Def. Exhs. 64-65, 71-72). Defendants introduced an outpatient note, dated March 1, 2011, wherein the attending physician wrote, "Ever since returning home from rehab, patient has been bed bound, unable to bear weight secondary to weakness, worsening chronic knee . . . pain . . . . The family states since she left the hospital she is usually confused and doesn't know where she is."  (Def. Exh. 68).  Defendants introduced an additional outpatient note, dated June 30, 2011, which noted that Vivian M. was "unable to give information of where she had come from or where she currently was" and that Vivian M. was not aware of the fact that her daughter had passed away earlier that day in her presence.  (Def. Exh. 61).

Dr. Patterson concluded that ambulance transports were medically necessary for Vivian M. 10% of the time, due to Vivian M.'s significant dementia.  (Doc. 230 at 106).  However, Dr. Patterson explained that a large proportion of Vivian M.'s trip sheets portrayed her as alert and oriented with respect to time, place, and person. (Id. at 107-08).

Given the cogent evidence presented through Dr. Duncan's testimony and report, which illustrated Vivian M.'s poor health and severe dementia, the court concludes that all ambulance transports of Vivian M. were medically necessary.

6.     *David T.*

Advantage transported David T. by ambulance 36 times between September 15, 2010 and October 26, 2010.  (Gov't Exh. 144).  Five EMTs identified David T. as being capable of safe wheelchair van transport, and 17 trip sheets referenced his ambulatory abilities.  (Id.)  David T. went to 5 Medicare-paid doctor's office visits in September and October of 2010 without ambulance transport.  (Gov't Exh. 43(X)).  Moreover, in an interview with an FBI Agent, David T. stated that he was both ambulatory and able to own and operate his own vehicle during this time period.[11]  (Gov't Exh. 112).  Therein, he represented that he regularly drove himself to the grocery store and to church.  (Id.)

David T.'s treating physician, Dr. Alisa Bell ("Dr. Bell"), submitted an affidavit explaining that she believed ambulance transport was medically necessary for David T.  (Def. Exh. 1, Dr. Bell Aff. ¶ 8).  Dr. Bell treated David T. for end stage renal disease from 2009 through 2011.  (Id. ¶ 5).  She saw David T. monthly during this time period.  (Id.)  Dr. Bell opined that ambulance transport was necessary for David T. primarily due to his history of congestive heart failure and chronic swelling in the lower extremities.  (Id. ¶ 8).

Dr. Duncan concluded that David T. required ambulance transport approximately 50% of the time.  (Doc. 229 at 76).  Dr. Duncan explained that David T. was abnormally stiff and rigid secondary to chronic edema; that he suffered from congestive heart failure and hypertension; that his medication was likely to cause

---

[11] The FBI interview report states that David T. "specifically recalled walking down the steps of his residence and then being placed on a litter when [Advantage] transported him."  (Gov't Exh. 112).

dizziness; and that he sometimes refused medical care. (Id. at 76-77). Dr. Duncan noted that the medical records he received pertaining to David T. were less comprehensive than those concerning other beneficiaries. (Id. at 76).

Dr. Patterson testified that the records pertaining to David T. did not indicate that he was unable to travel safely to and from dialysis via wheelchair van. (Doc. 230 at 110-12). Specifically, Dr. Patterson stated that she "did not see anything that suggested he couldn't bend his legs well enough to sit in a chair, at least during the transportations." (Id. at 110-11). Dr. Patterson concluded that none of David T.'s transports were medically necessary. (Id. at 51).

The court credits Dr. Bell's concerns about David T.'s medical conditions, as well as Dr. Duncan's testimony, Dr. Patterson's testimony, and David T.'s stated ability to ambulate independently and to operate a vehicle during the two-month transport period at issue. Factoring all of this evidence into its analysis, the court concludes that 50% of the value of David T.'s ambulance transports, or $3,656.50, should be included in the aggregate loss amount.

### 7. *Anna L.*

Advantage transported Anna L. 136 times between August 30, 2010 and February 7, 2011. (Gov't Exh. 144). Five EMTs opined that she could have been safely transported by wheelchair van. (Gov't Exh. 120). Anna L.'s name appeared on the "Patients Who Can Go By Wheelchair Van List," and 65 trip sheets referenced her ambulatory capabilities. (Id.)

Dr. Duncan opined that Anna L. required ambulance transport 100% of the time due to her various medical conditions. (Def. Exh. 4). Dr. Duncan testified that

Anna L. suffered from peripheral vascular disease, diabetes, hypertension, anemia, cardiac disease, neuropathy, depression, and coronary artery disease. (Doc. 229 at 79-81). Anna L. was on chronic dialysis for end stage renal disease. (Id. at 79, 82). Her records evidenced a history of MRSA, bacteremia, heart attack, stroke, and she had amputations on both of her hands. (Id. at 80-81). Dr. Duncan found it significant that Anna L.'s cognitive functioning was in decline and that her blood pressure was chronically labile, or difficult to control.  (Id. at 81, 85, 89).

Dr. Patterson testified that Anna L. appeared to be capable of sitting in a wheelchair for the majority of her documented transports. (Doc. 230 at 109). Dr. Patterson further explained that Anna L.'s early episode of delirium apparently cleared and that subsequent trip sheets were notably devoid of references to "combativeness, confusion, or concerns of self-injury." (Id.) In Dr. Patterson's opinion, none of Anna L.'s transports were medically necessary. (Id. at 51).

The court credits Dr. Duncan's comprehensive testimony and report. The court will not consider Anna L.'s ambulance transports in the aggregate loss amount.

### 8.   *Calas J.*

Advantage transported Calas J. via ambulance 191 times between June 25, 2009 and June 1, 2010. (Gov't Exh. 144). Eight EMTs identified Calas J. as being capable of safe transport by wheelchair van. (Gov't Exh. 120). One hundred two trip sheets made reference to Calas J.'s ambulatory abilities. (Id.) Six of these trip sheets described him as standing on his own, and 6 noted his ability to walk without assistance. (Gov't Exh. 121).

Calas J.'s general care physician, Dr. Williams, filed an affidavit concerning the medical necessity of Calas J.'s transports. (Def. Exh. 5, Dr. Williams Aff.). Dr. Williams opined that Calas J. required transport to and from dialysis via ambulance 100% of the time. (Id. ¶ 7). Dr. Williams treated Calas J. from June 2009 through his death in June 2010 for multiple conditions, including end stage renal disease, end stage liver disease, Hepatitis C, and hypertension. (Id. ¶ 5). Dr. Williams described Calas J. as "a total disaster, a train wreck." (Id.) He noted that Calas J. "would routinely go out to dialysis from hospice care, become hypotensive after dialysis and end up in the hospital." (Id.) According to Dr. Williams, "Putting [Calas J.] in a wheelchair van or anything else was an invitation for disaster. He could have become hypotensive, faint or pass out and risk falling." (Id. ¶ 7). In Dr. Williams's opinion, Calas J. required skilled monitoring during transports. (Id. ¶ 9).

Dr. Duncan's assessment of Calas J. was consistent with Dr. Williams's affidavit. (Def. Exh. 5). Dr. Duncan characterized Calas J. as "very sick," explaining that he required numerous hospitalizations between 2009 and 2011. (Doc. 229 at 91-99). Dr. Duncan described Calas J. as having "mental orientation issues" and observed that Calas J. refused dialysis treatment on multiple occasions. (Id. at 98-99). Dr. Duncan further observed that Calas J. died of cardiac arrest on June 7, 2011, shortly after his last transport from Advantage. (Id. at 91). Dr. Duncan concluded that Calas J. required ambulance transport 100% of the time. (Id. at 100).

Dr. Patterson opined that, contrary to the assertions set forth in Dr. Williams's affidavit, Calas J. was stable at certain points during the relevant time

23

period.  (Doc. 230 at 103-05).  Dr. Patterson reported that she found no evidence in Calas J.'s records to suggest that he required skilled monitoring while traveling to and from dialysis.  (Id. at 104).  Dr. Patterson thus concluded that ambulance transport was not medically necessary for Calas J.  (Id. at 51).

Based on Dr. Williams's affidavit and Dr. Duncan's testimony and report, the court finds that defendants have satisfied their burden of production.  Ambulance transports of Calas J. will not be considered for purposes of the loss amount.

### 9.     *Melvin H.*

Advantage transported Melvin H. 323 times from March 10, 2010 to May 9, 2011.  (Gov't Exh. 144).  Four EMTs testified before the grand jury that Melvin H. could have been safely transported by a wheelchair van.  (Gov't Exh. 120).  One hundred three trip sheets documented his ambulatory abilities.  (Id.)  Melvin H. attended 9 Medicare-paid doctor's appointments without ambulance transport during this time period.  (Id.)

Melvin H.'s nephrologist, Dr. Kaushal R. Patel ("Dr. Patel"), submitted an affidavit in which he opined that Melvin H. required ambulance transport for all necessary medical care.  (Def. Exh. 7, Dr. Patel Aff. ¶ 14).  Dr. Patel also authenticated four CMNs for Melvin H.  (Id. ¶ 12).  Dr. Patel treated Melvin H. for end stage renal disease, diabetes, hypertension, bilateral below the knee amputations, congestive heart failure, coronary artery disease, morbid obesity, and lung cancer, from 2009 until Melvin H.'s death in 2011.  (Id. ¶ 6).  Dr. Patel explained that, in his professional opinion, Melvin H. could not ambulate independently or sit in a wheelchair for transport.  (Id. ¶ 10).  Dr. Patel described Melvin H. as a

"morbidly obese double amputee, [who] was essentially bedridden and required a lift to get . . . to and from a bed to a transport litter." (<u>Id.</u> ¶ 11).

Dr. Duncan corroborated Dr. Patel's submissions regarding Melvin H. (Def. Exh. 7). Dr. Duncan testified that Melvin H. was consistently bed-confined and unable to ambulate. (Doc. 229 at 101-02). Dr. Duncan also testified concerning Melvin H.'s overlapping chemotherapy and dialysis treatments, explaining the negative side effects Melvin H. likely experienced as a result. (<u>Id.</u> at 105). Further, Dr. Duncan found it significant that Melvin H. apparently became increasingly confused and forgetful during the relevant time period. (<u>Id.</u> at 102). In conclusion, Dr. Duncan opined that ambulance transport was medically necessary for Melvin H. 100% of the time. (<u>Id.</u> at 106).

Dr. Patterson testified that Melvin H.'s trip sheets conflicted with Dr. Patel's affidavit. (Doc. 230 at 98-100). Specifically, Dr. Patterson noted that on several occasions EMTs documented Melvin H. sitting in a wheelchair. (<u>Id.</u> at 98). Dr. Patterson explained that there were "numerous references to [EMTs] finding [Melvin H.] in bed and putting him back in bed, but in between he was sitting in chairs." (<u>Id.</u> at 99). Dr. Patterson also found it significant that Melvin H. was required to travel only four miles—approximately sixteen minutes—to and from dialysis treatments. (<u>Id.</u>) Dr. Patterson concluded that Melvin H.'s ambulance transports were not medically necessary. (<u>Id.</u> at 51).

Based upon a review of Dr. Duncan's testimony and report and Dr. Patel's affidavit, the court finds that ambulance transport of Melvin H. was medically

necessary and will not include the amounts paid for his transport in the loss amount.

### 10.   *Josephine H.*

Advantage transported Josephine H. by ambulance 617 times between January 9, 2008 and April 2, 2010.  (Gov't Exh. 144).  Seven EMTs identified Josephine H. as being capable of safe wheelchair van transport.  (Gov't Exh. 120). Two hundred seventy-one trip sheets referenced her ambulatory capabilities.  (Id.) Eighteen documented Josephine H. standing, and 3 recorded her walking.  (Gov't Exh. 121).  Josephine H. traveled to 12 Medicare-paid doctor's office visits without ambulance transport during this time period.  (Id.)

Two of Josephine H.'s treating physicians, Dr. Diamond and Dr. Suneetha Vaddineni ("Dr. Vaddineni"), submitted affidavits indicating that Josephine H. required ambulance transport to and from dialysis treatments.  (Def. Exh. 6). Dr. Diamond treated Josephine H. from 2008 through 2009 for end stage renal disease.  (Id., Dr. Diamond Aff. ¶ 6).  He described Josephine H. as "[o]ne of the sickest" patients in his nephrology practice.  (Id. ¶ 9).  In Dr. Diamond's opinion, Josephine H. required ambulance transport because she was "very weak, debilitated, chronically ill, had poor cardiac function, and would fluctuate between very low and very high blood pressures."  (Id.)  Dr. Diamond noted that Josephine H. would have "slumped or fallen" if transported by wheelchair van.  (Id.)  Dr. Vaddineni also treated Josephine H. for end stage renal disease, from 2008 until her death in 2010.  (Id., Dr. Vaddineni Aff. ¶ 7).  Dr. Vaddineni determined that Josephine H. was at a serious risk of falling because, in addition to being extremely

frail and weak, she experienced tremors from Parkinson's disease and was often confused.  (Id. ¶ 10).

Dr. Duncan opined that Josephine H. required ambulance transport 80% of the time.  (Def. Exh. 6).  Dr. Duncan found that she exhibited low endurance levels and suffered from fatigue.  (Doc. 229 at 108).  He explained that he arrived at the figure of 80% in an attempt to be conservative, noting that there was some conflict in the records.  (Id.)  His ultimate assessment was based solely upon his review of Josephine H.'s medical records.  (Id.)

Dr. Patterson testified that Josephine H.'s records did not suggest that she could not sit safely in a wheelchair during transport.  (Doc. 230 at 67-70).  Dr. Patterson also reported that, based upon her review, Josephine H. did not appear to require oxygen monitoring when traveling to and from dialysis.  (Id.)  The government introduced multiple trip sheets through Dr. Patterson to show that Josephine H. exhibited ambulatory abilities and normal vital signs during transport.  (Id. at 71-77).  In Dr. Patterson's opinion, none of Josephine H.'s transports were medically necessary.  (Id. at 51).

The court finds the affidavits filed by Dr. Diamond and Dr. Vaddineni, supplemented by Dr. Duncan's testimony and report, to be persuasive.  The court will not consider Advantage's transports of Josephine H. when computing the loss amount.

### 11.   *Michael M.*

Advantage transported Michael M. by ambulance 432 times between May 18, 2010 and October 25, 2011.  (Gov't Exh. 144).  Eleven EMTs opined that Michael M.

could have been safely transported by wheelchair van. (Gov't Exh. 120). One hundred forty-nine trip sheets referenced Michael M.'s ambulatory abilities. (Id.) Twenty-four trip sheets documented Michael M. standing, 3 depicted him walking, 41 recorded his use of a walker, and 5 indicated that he was able to sit in a wheelchair. (Gov't Exh. 121).

Michael M.'s treating physician, Dr. Rothman, submitted an affidavit explaining that she believed ambulance transport was medically necessary for Michael M. (Def. Exh. 2, Dr. Rothman Aff. ¶ 16). Dr. Rothman treated Michael M. for end stage renal disease, diabetes, hypertension, sleep apnea, congestive heart failure, polycythemia, depression, morbid obesity, seizure disorder, sepsis, and a spinal infection, from 2006 until his death in 2011. (Id. ¶ 6). Dr. Rothman opined that ambulance transport was necessary for Michael M. primarily because he "was essentially bedridden and required a lift to get . . . to and from bed to a transport litter, and he was too large to use a wheelchair."[12]  (Id. ¶ 8).

Dr. Duncan testified that Michael M.'s medical history included the following conditions: diabetes, anticoagulation, pulmonary embolus, end stage renal disease, MRSA, depression, congestive heart failure, sepsis, debilitating pain secondary to a spinal infection and morbid obesity, and seizure disorder. (Doc. 229 at 114-16). Dr. Duncan concluded, based upon the medical records made available to him, that ambulance transport was medically necessary for Michael M. 85% of the time. (Id. at 116). In forming his opinion, Dr. Duncan relied in part on a September 20, 2010

---

[12] On July 25, 2010, Michael M. weighed approximately 337 pounds. (Doc. 230 at 3).

letter written by Dr. Rothman.  (Id.; see Gov't Exh. 142; Doc. 156-13 at 24).  Therein,

Dr. Rothman stated that Michael M. was "unable to ambulate at all" and that "due

to his size, [he was] basically bedridden and require[d] a lift to get . . . to and from

bed to the transport litter."  (Gov't Exh. 142; Doc. 156-13 at 24).

     Dr. Patterson testified that certain representations set forth in Dr. Rothman's

affidavit were refuted by Michael M.'s records.  (Doc. 230 at 84).  The government

introduced multiple trip sheets through Dr. Patterson to show that Michael M.

(1) was capable of sitting in a wheelchair, and (2) ambulated with the assistance of a

walker.  (Id. at 85-90).  These trip sheets spanned from May 25, 2010 to November

15, 2010.  (Gov't Exh. 142; Doc. 230 at 85-90).  Dr. Patterson highlighted one trip

sheet in particular, dated September 20, 2010, wherein the EMT found Michael M.

sitting in a wheelchair following dialysis treatment.  (Gov't Exh. 142; Doc. 230 at

89-90).  Upon his return home, Michael M. moved from the ambulance to a walker.

(Gov't Exh. 142; Doc. 230 at 89-90).  Dr. Patterson juxtaposed this trip sheet with Dr.

Rothman's letter described supra, which was also dated September 20, 2010.  (Gov't

Exh. 142; Doc. 230 at 89-90).  Dr. Patterson concluded that Michael M.'s transports

were not medically necessary.  (Doc. 230 at 51).

     The court credits Dr. Rothman's concerns about the transport challenges

attendant to Michael M.'s morbid obesity and other medical conditions.  However,

the court also credits Dr. Duncan's testimony, Dr. Patterson's testimony, and the

evidence introduced by the government tending to show that Michael M. was

neither bedridden nor immobile during a significant portion of the time period

under review.  The court has factored all of this evidence into its conclusion

concerning loss amount.  As such, the court will consider 50% of the value of Michael M.'s ambulance transport, or $43,355.50, in the loss amount.

### B.    Loss Amount Summary

As noted *supra*, the parties present exceptionally divergent views regarding the appropriate loss amount to be attributed to defendants.  Faced with two extremes, the court finds that defendants have substantially satisfied their burden of production to counter the government's *prima facie* evidence concerning the 11 beneficiaries *sub judice*.  The court concludes that Advantage and Sivchuk should be responsible for a loss amount of $194,378.50.  This number is composed of $105,570 for 50% of Doris B.'s transports, $7,340 for Sandra Bo.'s transports, $34,456.50 for 50% of James R.'s transports, $3,656.50 for 50% of David T.'s transports, and $43,355.50 for 50% of Michael M.'s transports.  This loss amount results in a 10-level increase to defendants' base offense levels of 6.  U.S.S.G. § 2B1.1(b)(1)(F).

The government asserts that the loss amount should be increased by an additional $37,576 for Advantage's Medicare claims that were denied during pre-payment review.  (Doc. 231 at 65, 79-80; Gov't Exhs. 129, 144).  The government purports to derive this figure from claims submitted for 181 ambulance transports of 10 dialysis patients.  (Doc. 231 at 65, 79-80; Gov't Exhs. 129, 144).  However, the government fails to proffer any evidence regarding the 181 ambulance rides, the 10 beneficiaries, or the government's methodology for calculating this amount.  (See Doc. 232 at 29-32).  As previously noted, the government bears the burden of persuasion to establish the loss amount involved in the offense by a preponderance

of the evidence.  <u>Diallo</u>, 710 F.3d at 151.  In light of the paucity of evidence on this point, the court rejects the government's argument and finds that there is no basis for adding an intended loss of $37,576 to the total loss amount.

**IV.**    **Conclusion**

For the foregoing reasons, the court finds a loss amount of $194,378.50, which provides for a 10-level increase in defendants' offense levels.  <u>See</u> U.S.S.G. § 2B1.1(b)(1)(F).  The court will calculate defendants' final Guidelines ranges, rule on any motions for departure, and consider the 18 U.S.C. § 3553(a) factors on the record at sentencing.  An appropriate order follows.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        June 12, 2015